**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| REPRESENTATIVE CHRISTOPHER SHAYS, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 04-1597 (EGS) ) |
| FEDERAL ELECTION COMMISSION, | ) ) |
| Defendant. | ) ) |

<u>**MEMORANDUM OPINION**</u>

Plaintiffs, Representatives Christopher Shays and Martin Meehan, brought this suit under the Administrative Procedures Act ("APA") to compel defendant, the Federal Election Commission ("FEC"), to issue regulations concerning the applicability of campaign finance laws to "527 groups." In March 2006, this Court remanded the matter to the FEC to institute rulemaking or properly explain why it was employing case-by-case adjudication rather than rulemaking to regulate 527 groups. The FEC issued its revised explanation and justification in February 2007. Pending before the Court are plaintiffs' motion for further relief and defendant's renewed motion for summary judgment. Upon consideration of the motions and supporting memoranda, the responses and replies thereto, the applicable law, the arguments made at the motions hearing on July 31, 2007, and the entire

1

record, the Court determines that the FEC's revised explanation
is sufficient under the APA to justify its choice not to engage
in rulemaking.  Therefore, for the reasons stated herein,
plaintiffs' motion for further relief is **DENIED**, and defendant's
motion for summary judgment is **GRANTED**.

## BACKGROUND

In its 2006 opinion, the Court set out in detail the
statutory background and procedural history at the agency level,
*Shays v. FEC*, 424 F. Supp. 2d 100, 105-08 (D.D.C. 2006), so it
need only be summarized here.  Section 527 of the Internal
Revenue Code permits income tax exemptions for a "political
organization."  26 U.S.C. § 527(a).  A political organization, or
"527 group," is defined as a "party, committee, association,
fund, or other organization (whether or not incorporated)
organized and operated *primarily for the purpose* of directly or
indirectly accepting contributions or making expenditures, or
both, for an exempt function."  *Id.* § 527(e)(1) (emphasis added).
An "exempt function" is "the function of influencing or
attempting to influence the selection, nomination, election, or
appointment of any individual to any Federal, State, or local
public office or office in a political organization, or the
election of Presidential or Vice Presidential electors."  *Id.* §
527(e)(2).

The Federal Election Campaign Act ("FECA") and related campaign finance laws regulate "political committees." 2 U.S.C. § 431(4). Once an organization is defined as a political committee, it is subject to a host of regulations: it must file a "statement of organization" with the FEC, 2 U.S.C. § 433; file periodic disclosure reports of its receipts and disbursements, *id.* § 434; and adhere to contribution limits, *id.* § 441a-1(a)(1)-(2). A political committee is subject to these regulations even if it is engaged only in spending independent from any particular political party or candidate. 11 C.F.R. § 110.1(n).

A "political committee" is statutorily defined as "any committee, club, association, or other group of person which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $ 1,000 during a calendar year." 2 U.S.C. § 431(4). In addition, the Supreme Court has construed "political committee" only to "encompass organizations that are under the control of a candidate or *the major purpose of which is the nomination or election of a candidate*." *Buckley v. Valeo*, 424 U.S. 1, 79 (1976) (emphasis added). This "major purpose" test has never been codified in a regulation, but is applied by the FEC in its enforcement actions against individual organizations. *Shays*, 424 F. Supp. 2d at 106.

Beginning in March 2004, the FEC considered promulgating additional rules concerning a variety of issues involving the definitions of "political committee," "contribution," and "expenditure." *Id.* at 106-07. The agency issued a notice of proposed rulemaking, received thousands of comments, and heard testimony from 31 witnesses. *Id.* The FEC specifically considered two proposals – the "Thomas-Toner proposal" and its General Counsel's recommendation – for regulations that would codify standards for the "major purpose" test, specifically with regard to 527 groups. *Id.* at 107-08. Both proposals were rejected and the FEC instead issued an Explanation and Justification on November 23, 2004, explaining why it took no action to re-define "political committee." *Id.* at 108. Thus, the FEC elected to continue applying the general "political committee" definition and "major purpose" test on a case-by-case basis instead of promulgating more detailed regulations. *Id.* at 108, 112-13.

Plaintiffs filed this suit in September 2004, claiming that the FEC's failure to issue a rule governing when 527 groups must register as political committees is arbitrary and capricious. *Id.* at 103. Plaintiffs asked the Court to direct the FEC to promulgate regulations defining when a 527 group must register as a political committee. *Id.* In 2006, the Court ruled on the parties' cross-motions for summary judgment. As an initial

4

matter, the Court concluded that plaintiffs had standing to bring their claims and that the claims were ripe for adjudication.  *Id.* at 110-12.  On the merits, the Court concluded that the agency's decision to pursue adjudication over rulemaking of 527 groups was not, per se, an abuse of discretion.  *Id.* at 114.

The Court, however, concluded that the FEC had failed to provide a reasoned explanation for its decision to regulate 527 groups through adjudication instead of rulemaking.  *Id.* at 116. The Court found that the agency had described why the regulation of 527 groups is complicated, but had failed to explain "how the problem becomes any less complicated or any more manageable if the FEC pursues case-by-case adjudication."  *Id.* at 115.  The Court also expressed concerns over whether regulation through case-by-case adjudication would be: (1) sufficiently definitive to satisfy First Amendment and Due Process concerns; (2) more effective than rulemaking in carrying out Congress's intent to prevent the flow of "soft money" into federal campaigns; (3) executed on a timely basis within an election cycle; and (4) resolved in a way that would provide guidance to other 527 groups more generally.  *Id.* at 115-16.  In issuing a remedy, the Court refused to direct the FEC to promulgate rules regarding 527 groups and the definition of "political committee," and instead remanded the case to the agency to either better explain its decision or institute new rulemaking.  *Id.* at 116.

5

In response to the Court's order, the FEC issued a supplemental explanation and justification in February 2007. Political Committee Status, Supplemental Explanation and Justification, 72 Fed. Reg. 5595 (Feb. 7, 2007). The explanation began by setting forth the agency's view of the operative regulatory regime, specifically with regard to the "contribution," "expenditure," and "major purpose" requirements of the definition of "political committee." *Id.* at 5596-97. In this analysis, the FEC asserted that the Supreme Court in *Buckley* limited "expenditure," when applied to communications made independently of a candidate, to only include "express advocacy." *Id.* at 5597 (citing *Buckley*, 424 U.S. at 44, 80). In the explanation's second part, the agency established why all 527 groups may not qualify as a "political committees." *Id.* at 5597-99. In the explanation's third part, the agency demonstrated that Congress has heretofore decided not to classify every 527 group as a "political committee." *Id.* at 5599-5601. In the explanation's fourth part, the agency asserted that application of the "major purpose" test requires the flexibility of case-by-case analysis of an organization's conduct that is incompatible with rulemaking. *Id.* at 5601-02. In the explanation's fifth part, the agency claimed that two rules enacted in 2004 concerning the definition of "contribution" and the allocation of federal funds strengthened its regulation of 527 groups. *Id.* at

5602-03.  Finally, in the explanation's sixth part, the agency
asserted that recent resolutions of several administrative
enforcement matters involving 527 groups established the
effectiveness of its adjudicative approach.  *Id.* at 5603-06.  For
these reasons, the FEC stated that it would continue applying the
general "political committee" definition and "major purpose" test
on a case-by-case basis.  *Id.* at 5606.

Following issuance of the supplemental explanation,
plaintiffs moved for further relief.  Plaintiffs contend that the
new explanation also violates the APA and that the Court should
order the FEC to issue an appropriate regulation focused on 527
groups within 90 days of the Court's order.  Specifically,
plaintiffs argue that the FEC still has not provided a reasoned
explanation for its decision to eschew rulemaking for 527 groups,
and that its new explanation is premised on a fundamental
misinterpretation of the law.  The FEC opposes this motion and
also moves for summary judgment, contending that its actions now
satisfy the APA.  Specifically, the FEC argues that its revised
explanation easily passes muster under the highly deferential
standard of review that the Court must apply.

## STANDARD OF REVIEW

Summary judgment should be granted only if the moving party
has shown that there are no genuine issues of material fact and
that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp.*, 477 U.S. at 324.

When reviewing agency action pursuant to the APA, the Court must determine whether the challenged decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) (holding that an agency's decision to choose either rulemaking or case-by-case adjudication is subject to reversal only if the agency committed an "abuse of discretion or a violation of [law].").  In applying the "arbitrary and capricious" standard, a court "may not supply a reasoned basis for the agency's action that the agency itself has not given," but a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 43 (1983).  Upon review of an agency's action, the Court must engage in a "thorough, probing, in-depth review" to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971).

While the court's inquiry must be "searching and careful," the standard of review is also a highly deferential one; the agency's actions are "entitled to a presumption of regularity," and the Court cannot "substitute its judgment for that of the agency." *Id.*  Moreover, "an agency's burden of supplying a 'reasoned analysis' justifying its policy is lower where, as here, an agency is continuing a long-standing policy compared to where the agency is suddenly changing that policy." *Bellevue Hosp. Center v. Leavitt*, 443 F.3d 163, 176 (2d Cir. 2006). Finally, a court will "sustain an agency decision resting on several independent grounds if any of those grounds validly supports the result." *Carnegie Natural Gas Co. v. FERC*, 968 F.2d 1291, 1294 (D.C. Cir. 1992).

Courts have espoused the view that regulation through rulemaking is preferable where possible.  *See SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947) ("Since the Commission, unlike a court, does have the ability to make new law prospectively through the exercise of its rule-making powers, it has less

reason to rely upon ad hoc adjudication to formulate new standards of conduct."); *Trans-Pac. Freight Conference of Japan/Korea v. Fed. Mar. Comm'n*, 650 F.2d 1235, 1244-45 (D.C. Cir. 1980) ("Rule-making is an essential component of the administrative process and indeed is often the preferred procedure for the evolution of agency policies."). Rulemaking has the advantage of being more precise, including all interested parties in its formation, and providing clear prospective guidance to regulated entities. *Trans-Pac. Freight*, 650 F.2d at 1245. On the other hand, not "every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule." *Chenery*, 332 U.S. at 202. An "agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule, [or] the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule." *Id.* at 202-03.

Therefore, the decision of whether to proceed through case-by-case adjudication or by general rulemaking lies largely within the agency's discretion. *Id.* at 203 ("the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the agency"); *Nat'l Small Shipments Traffic Conference, Inc. v. ICC*, 725 F.2d 1442, 1447 (D.C. Cir. 1984). In fact, the D.C.

Circuit has stated that "agency discretion is at its peak in deciding such matters as whether to address an issue by rulemaking or adjudication." *American Gas Ass'n v. FERC*, 912 F.2d 1496, 1519 (D.C. Cir. 1990); *see also Massachusetts v. EPA*, 127 S. Ct. 1438, 1459 (2007) ("Refusals to promulgate rules are thus susceptible to judicial review, though such review is 'extremely limited' and 'highly deferential.'").

## ANALYSIS

### I. FEC's Misinterpretation of *Buckley*

Plaintiffs contend that the FEC's new explanation contains a fundamental mistake of law and that this error fatally undermines the FEC's reasoning. At issue is the definition of "expenditure" within the larger definition of "political committee." A "political committee" is statutorily defined as a group "which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $ 1,000 during a calendar year." 2 U.S.C. § 431(4)(A). The statute defines "expenditure" and "contribution" to encompass any spending or fundraising, respectively, "for the purpose of influencing" an election. *Id.* §§ 431(8)(A)(i); 431(9)(A)(i).

In discussing the Supreme Court's *Buckley* decision, the FEC stated that in order to address First Amendment concerns, "the Supreme Court held, when applied to communications made independently of a candidate or a candidate's committee, the term

11

'expenditure' includes only 'expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office.'"   Supplemental Explanation, 72 Fed. Reg. at 5597 (citing *Buckley*, 424 U.S. at 44, 80).   In other words, the FEC believes that there is an "express advocacy requirement for expenditures on communications made independently of a candidate," which applies to all organizations regardless of whether they satisfy the "major purpose" test.   *Id.*; *see also id.* at 5604 (describing how the FEC applied the express advocacy requirement to organizations that satisfied the "major purpose" test).

As plaintiffs contend, this is a misreading of *Buckley*.   In *Buckley*, the Court addressed constitutional concerns that the statutory definition of "political committee" was overbroad and, to the extent it incorporated the definition of "expenditure," vague as well.   424 U.S. at 78-79.   The Court found the term "expenditure" caused "line drawing problems" by potentially "encompassing both issue discussion and advocacy of a political result," so that the "political committee" standard might "reach groups engaged purely in issue discussion."   *Id.* at 79.   The Court resolved these concerns by imposing two different limiting constructions.   First, it narrowed the definition of "political committee" to encompass only "organizations that are under the control of a candidate or the major purpose of which is the

12

nomination of election of a candidate." *Id.* For such "major purpose" groups, there is no concern about vagueness of the "expenditure" definition because disbursements by such groups "can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related." *Id.* Second, "when the maker of the expenditure is not within these categories [–] when it is an individual other than a candidate or a group other than a 'political committee,'" the Court narrowly construed the term "expenditure" to reach "only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 79-80.

Thus, the Court imposed the narrowing gloss of express advocacy on the term "expenditure" only with regard to groups other than "major purpose" groups. *Id.* at 80. The Court has since reaffirmed this position. In the 2003 *McConnell* case, the Court, quoting *Buckley*, noted that "a general requirement that political committees disclose their expenditures raised no vagueness problems because the term 'political committee' 'need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate' and thus a political committee's expenditures 'are, by definition, campaign related.'" *McConnell v. FEC*, 540 U.S. 93, 169 n.64 (2003). Therefore, having

13

misinterpreted *Buckley*, the FEC is applying the express advocacy requirement to expenditures in cases where it is unnecessary.

While the FEC has erred in its legal interpretation of *Buckley*, this error is harmless with regard to plaintiffs' claims in this case.  Under the APA, courts must consider whether errors are harmless or prejudicial.  *See Nevada v. DOE*, 457 F.3d 78, 90 (D.C. Cir. 2006).  Even if the FEC does not apply the express advocacy test to organizations that meet the "major purpose" test, the agency must still evaluate whether the organization's spending is an "expenditure," *i.e.* whether it is spending "for the purpose of influencing" an election.  *See* 2 U.S.C. § 431(9)(A)(i).  Therefore, the decision of whether to codify detailed standards for the "major purpose" test in a general rule — the subject of this suit — is separate and apart from the question of the proper interpretation of "expenditure."

Plaintiffs argue that the issues are nonetheless connected because the FEC, by improperly expanding the application of the express advocacy test, commits to evaluating the "expenditures" of an organization before evaluating its "major purpose," and thus turns the "major purpose" inquiry into a "hollow shell." Plaintiffs support this argument by pointing to the FEC's analysis of particular organizations where the agency determined an organization's purpose by examining their spending and fundraising.  However, this procedure is not unlawful in any way.

14

While plaintiffs would like the agency to first determine an organization's major purpose, with particular focus on whether they are a 527 group, neither the statute nor judicial precedent establishes any particular "order of operations" in making the "political committee" determination.  Therefore, the FEC's erroneous interpretation of law is a harmless error.

## II. FEC's Less Convincing Arguments

Plaintiffs contend that the FEC's new explanation still fails to provide a reasoned basis for its decision to regulate 527 groups through case-by-case adjudication instead of rulemaking.  Plaintiffs are correct that the FEC's revised explanation contains several justifications for its decision that are either irrelevant or insufficient.  First, the FEC belabors the point that organizations cannot qualify as "political committees" solely because they are 527 groups.  Supplemental Explanation, 72 Fed. Reg. at 5597-99.  This fact, however, does not speak to whether rulemaking is appropriate because a rule can take into account other factors besides an organization's 527 status.  In fact, the proposed rules put before the agency in 2004 explicitly accounted for additional factors, and did not simply equate 527 groups with "political committees."  *See Shays*, 424 F. Supp. 2d at 107 n.2 (describing Thomas-Toner proposal, which stated that 527 groups did not meet the "major purpose" test if, for instance, they were organized solely to promote

candidates for a non-Federal office).  Thus, the agency's
simplistic analysis fails to provide a logical reason for
rejecting a rulemaking approach.

Second, the FEC relies on the fact that Congress has neither
specifically stated in a statute that all 527 groups are
"political committees," nor has directed the FEC to adopt revised
regulations regarding "political committees" or 527 groups.
Supplemental Explanation, 72 Fed. Reg. at 5599-5601.  Again, the
former fact is beside the point because no party has ever argued
that all 527 groups are political committees, or that the
rulemaking would necessarily institute such a standard.  As for
the latter fact, this Court has already reached the same
conclusion.  *See Shays*, 424 F. Supp. 2d at 114.  Neither of these
facts, however, bear of the question of which statutorily-
permitted method the agency should use to determine whether a
particular 527 group is a "political committee."

Third, the FEC advances the argument that two recently
enacted regulations mitigate the need for rulemaking with regard
to 527 groups.  Supplemental Explanation, 72 Fed. Reg. at 5602-
03.  The first regulation expands the regulatory definition of
"contribution" to capture funds solicited for the specific
purpose of supporting or opposing the election of a federal
candidate.  *See* 11 C.F.R. § 100.57.  As with the dispute over the
proper interpretation of "expenditure," however, adjusting the

definition of "contribution" is separate and apart from
plaintiffs' principle contention – that the FEC should adopt a
rule that codifies the "major purpose" test.  In addition, an
academic report, submitted along with defendant's motion,
concluded that the regulation is not relevant to the majority of
527 groups.  Campaign Finance Institute ("CFI"), *Soft Money in
the 2006 Election and the Outlook for 2008*, at 4 (2007), Def.'s
Ex. 8.  The second regulation places limits on the non-Federal
funds a registered political committee may use to engage in
certain activities, such as voter drives and campaign
advertisements, which have a clear federal component.  *See* 11
C.F.R. § 106.6; *see also* CFI, *Soft Money in the 2006 Election*, at
4 (noting that the regulation only applies to 2% of political
committees and is easily circumvented).  This regulation is
irrelevant to the issue at hand because it only applies once an
organization is classified as a political committee, and has no
bearing on making that determination in the first place.

Fourth, the FEC stated that "even if the Commission were to
adopt a regulation encapsulating the judicially created major
purpose doctrine, that regulation could only serve to limit,
rather than to define or expand, the number or type of
organizations regarded as political committees."  Supplemental
Explanation, 72 Fed. Reg. at 5602.  The logic of this
justification escapes the Court.  Regardless of whether the FEC

17

utilizes rulemaking or case-by-case adjudication, the major purpose doctrine must be applied.  *See Buckley*, 424 U.S. at 79-80.  Thus, the same organizations should qualify as political committees whether rulemaking or adjudication is employed.  The question before the FEC and the Court is whether regulation under the doctrine will be more effective with rulemaking or not.

Finally, the FEC claims that rulemaking has no advantage over adjudication because any "revised rule adopted by the Commission would still have to be interpreted and applied through the very same statutory enforcement procedures as currently exist."  *Id.*  Under this logic though, the FEC's extensive set of existing campaign finance regulations are all superfluous because adjudication would ultimately occur anyway.  This argument is plainly flawed because many regulated entities comply with codified regulations without having to be prosecuted.  Thus, plaintiffs claim that codifying the major purpose test would be more effective because it would create more voluntary compliance than the uncertainty of the adjudicatory process alone.

## III.  Complexity and Recent Adjudicatory Decisions

Putting aside the FEC's unpersuasive arguments, the crux of the FEC's revised justification is that the complexity of applying the "major purpose" test to a particular organization requires that it be done through adjudication instead of rulemaking.  According to the agency, "[a]pplying the major

purpose doctrine . . . requires the flexibility of a case-by-case analysis of an organization's conduct that is incompatible with a one-size-fits-all rule." Supplemental Explanation, 72 Fed. Reg. at 5601. The FEC described several factors that are part of this "major purpose" analysis for an organization: (1) whether there is sufficiently extensive spending on federal campaign activity; (2) the content of public statements, including consideration of the form and nature of the statements as well as the speaker's position within the organization; (3) internal statements of the organization; (4) all manner of the organization's spending; and (5) the organization's fundraising appeals. *Id.* Notably, the agency did not list an organization's tax status as a relevant factor, though it could be considered a public statement of purpose. The FEC concluded that none of the proposed rules raised in 2004 "would have accorded the Commission the flexibility needed to apply the major purpose doctrine appropriately," and thus declined to adopt them. *Id.* at 5602.

The agency also asserted that the Supreme Court's decisions in *Buckley* and *FEC v. Massachusetts Citizens For Life, Inc.*, 479 U.S. 238 (1986) ("MCFL"), "make clear that the major purpose doctrine requires a fact-intensive analysis of a group's . . . activities." Supplemental Explanation, 72 Fed. Reg. at 5602. Those cases, however, in no way compel that conclusion. *Buckley* established the major purpose test, but did not describe its

application in any fashion.  *See Buckley*, 424 U.S. at 79-80.  And the Court in *MCFL* only made the lone statement that an organization's "independent spending [may] become so extensive that the organization's major purpose may be regarded as campaign activity."  *MCFL*, 479 U.S. at 269.  Thus, the FEC's fact-intensive approach may be compelled by the nature of the inquiry, but is not compelled by any judicial precedent.

The FEC has also recently applied the "political committee" definition to several 527 groups through the resolution of administrative enforcement matters.  Supplemental Explanation, 72 Fed. Reg. at 5603-06 (describing enforcement actions against Swiftboat Veterans and POWs for Truth, League of Conservation Voters, and the MoveOn.org Voter Fund).  These proceedings resulted in Conciliation Agreements, which are settlement agreements between the agency and regulated party that are reached in the pre-litigation stage of the enforcement process. *See, e.g.*, Conciliation Agreements for 527 Groups, Def.'s Exs. 2-7.  Through the agreements, the regulated entities agree not to contest the agency's conclusions, promise to comply with the campaign finance laws in the future, and agree to a civil penalty.  In these recent actions, the agency has found that several 527 groups should have been registered as political committees, and the groups agreed to fines between $45,000 and $750,000.  *Id.*; *see also* CFI, *Soft Money in the 2006 Election*, at

4-10 (noting that the agency's actions have left many 527 groups unaffected, but also spurred some to convent their groups into unregulated 501(c) groups).

The agreements provide factual and legal analysis supporting the agency's finding that the organizations should have registered as political committees.  In analyzing spending, the agency erroneously applied the express advocacy test for expenditures and examined the organizations' advertisements that were run, including when and where they ran, and how much they cost, as well as other activities such as door-to-door canvassing and phone banks.  Supplemental Explanation, 72 Fed. Reg. at 5604. In analyzing fundraising, the agency examined the content of fundraising appeals, including email messages, telephone calls, and personal meetings.  *Id.* at 5604-05.  In analyzing the major purpose of each organization, the agency again evaluated fundraising solicitations, contribution sources, public statements and internal documents, and the full range of campaign activities.  *Id.* at 5605.  Each of these analyses were very fact-specific for each organization.  Notably though, the agency did not rely on the organizations' statuses as 527 groups. Nonetheless, the FEC contends that this case-by-case approach provides "a very effective mechanism for regulating organizations that should be registered as political committees under FECA,

21

regardless of that organization's tax status," and "places the regulated community on notice of the state of law." *Id.* at 5606.

Evaluating the agency's complexity or "flexibility" rationale for preferring adjudication is difficult.  Plaintiffs contend that the agency's approach provides little guidance to regulated parties, is less effective because it cannot be completed within an election cycle, and is vulnerable to attacks under the First Amendment or Due Process.  These are also the concerns expressed by the Court in 2006.  *Shays*, 424 F. Supp. 2d at 115-16.  Nevertheless, the agency's underlying argument is that because the major purpose test requires examination of so many facets of an organization, no articulable rule would reach the correct result in all cases.  And if only case-by-case analysis is accurate, then the need for flexibility would seem to trump the other concerns of plaintiffs and the Court.  *See Chenery*, 332 U.S. at 203 ("the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule").  Thus, the fundamental question is whether the FEC's complexity argument is sufficient to justify its decision.

On the one hand, the plaintiffs' proposed rules, such as the Thomas-Toner proposal, appear to be sound policies given the definition of 527 status and political committees.  The major purpose test seeks to identify whether an organization's "major"

purpose is the "nomination or election of a [federal] candidate."
A 527 group, by definition, has the "primary" purpose of raising
or spending money to influence the election or appointment of an
individual to a political office.  Thus, an organization's usage
of 527 status is inherently indicative of its choice to
principally engage in electoral activity, which goes a long way
to satisfying the major purpose test.  A rule that utilizes the
fact of an organization's 527 status therefore appears to be
quite reasonable, as long as it accounts for circumstances where
527 groups are primarily concerned with unelected or non-federal
offices.  In fact, in all cases where the FEC applied the major
purpose test to a 527 group, the test was satisfied.

On the other hand, there may arise complex cases where the
major purpose of a 527 group is a difficult question.  Even if an
organization elects to use 527 status, it may engage in many non-
electoral activities so that determining its major purpose
requires a very close examination of various activities and
statements.  Or an organization may be engaging in substantial
amounts of both federal and non-federal electoral activity, again
requiring a detailed analysis of its various activities.  In such
cases, a rule such as those proposed by plaintiffs may not take
into account all the factors required to reach the correct
determination.  While the FEC may not have yet confronted such a
case, the Court cannot reject the possibility out of hand.

Finally, the Court recognizes that the FEC has successfully brought enforcement actions against 527 groups since the 2006 opinion, which demonstrates that the case-by-case approach can be at least somewhat effective.

Given the arguments on both sides of the balance, the Court ultimately must rely on the applicable standard of review.  As this discussion illustrates, determining whether a particular legal issue is too multifaceted to be codified requires a nuanced understanding of the regulatory scheme and industry in question.  Thus, this question is exactly the type of question generally left to the expertise of an agency, and the applicable standard of review is that "agency discretion is at its peak."  *American Gas Ass'n v. FERC*, 912 F.2d 1496, 1519 (D.C. Cir. 1990).

It is not surprising, therefore, that plaintiffs have been unable to cite any case where a court, absent a clear directive from Congress, required an agency to institute rulemaking in the place of adjudication.  This Court will not be the first.  Even if the Court believes as a matter of policy that rulemaking is viable for the major purpose test, the Court may not substitute this judgment for the agency's decision.  Therefore, the Court concludes that the FEC's revised explanation is sufficient under the APA and its decision not to employ rulemaking is not arbitrary and capricious.

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion for further relief is **DENIED**, and defendant's motion for summary judgment is **GRANTED.** An appropriate Order accompanies this Memorandum Opinion.

Signed:     **Emmet G. Sullivan**
            **United States District Judge**
            **August 30, 2007**